## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**JON CLINTON KETTERMAN,**

      **Plaintiff,**

**v.**

                                **Civil Action No.: 2:15cv18**
                                **(The Honorable John P. Bailey)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

      **Defendant.**


## REPORT AND RECOMMENDATION/OPINION

      Jon Clinton Ketterman ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of the final decision of the defendant, Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. §§ 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

      Plaintiff filed an application for DIB on March 1, 2012, alleging disability beginning on November 21, 2011. Plaintiff's applications were denied at the initial and reconsideration levels. Plaintiff thereafter requested a hearing, which Administrative Law Judge Karen B. Kostol ("ALJ") held on November 4, 2013, and at which Plaintiff, represented by counsel, and Ms. Linda Dezack, an impartial Vocational Expert ("VE"), testified. On December 16, 2013, the ALJ entered a decision finding Plaintiff was not disabled. Plaintiff appealed this decision to the

Appeals Council and, on January 13, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

## II. FACTS

### A. Personal History

At the administrative hearing held on November 4, 2013, Plaintiff revealed his personal information. He was born on December 25, 1975, and was thirty-seven (37) years old at the time of the hearing (R. 47). He stated that he was currently married with two children ages seven (7) and three (3). Id. He completed his high school education, but has no completed any college course work (R. 48).

### B. Medical History Summary

#### 1. Medical History Pre-Dating November 21, 2011

On July 29, 2008, Plaintiff was referred to Dr. Mohamed Fahim, M.D., at the Davis Memorial Hospital Pain Management Center (R. 326). Due to a car accident, Plaintiff indicated to Dr. Fahim that he was suffering from lower back pain. Id. He stated that the pain radiated to his hips and described the pain as shooting, stabbing, achy, tingling, tender, numbing and deep. Id. The pain increases when Plaintiff standing, lifting, housework, coughing, or lying flat. Id. Physical examination revealed that Plaintiff's gait was steady; positive straight let test; tenderness over the sacroiliac joints; decreased range of motion of the spine; and intact motor strength and sensations. Id. MRI results showed that Plaintiff had a large central disc protrusion at L5-S1 (R. 328). Dr. Fahim prescribed him pain medication and recommended to him to undergo injections[1] (R. 328).

---

[1] Plaintiff underwent injections from August 2008 to December 2009 (R. 299, 300, 305, 306, 307, 310–13, 316–17, 320–24).

On October 17, 2008, Plaintiff had another appointment with Dr. Fahim for lower back pain (R. 318). Described as a 6/10, Plaintiff reported that the pain increases when he bends forward. Id. Dr. Fahim indicated that Plaintiff had tenderness over his right lumbar facet joints and had mild tenderness over his sacroiliac joints, lower back, and midline. Id. Dr. Fahim recommended injections and medication (R. 318–19).

In early February 2009, Plaintiff met with Dr. Fahim for lower back pain (R. 314). Plaintiff stated that his pain is in the lower back and increases by extension and bending. Id. Described as stabbing and achy, Plaintiff noted it was a 3/10 on the pain scale. Id. Physical examination revealed tenderness over the right lumbar facet joints. Id. Dr. Fahim recommended more injections (R. 315).

On April 9, 2009, Plaintiff visited with Dr. Fahim with lower back pain (R. 308). He stated that his intermittent lower back pain now radiates to his lower extremities. Id. The pain is sharp and increased with walking, lifting, and bending. Id. Plaintiff described the pain as a 6/10. Id. Dr. Fahim noted no tenderness on Plaintiff's lower back, hips, and right lumbar facet joints. Id. Dr. Fahim scheduled Plaintiff for more injections. Id.

Plaintiff met with Dr. Fahim in mid-August 2009 with lower back pain (R. 303). He stated that he has no pain in his left lower extremities and describes his current pain as 3/10 and achy. Id. He also indicated the pain occurs when he lifts or bends. Id. Physical examination revealed no tenderness on lower back and hips. Id. Dr. Fahim recommended continued medication (R. 304).

On October 29, 2009, Plaintiff returned to see Dr. Fahim complaining of lower back pain and bilateral hip pain (R. 301). Plaintiff described the pain as a 5/10 and aching in character. Id. The pain increased when Plaintiff squats and gets up from a sitting position. Id. Following

physical examination, Dr. Fahim opined that Plaintiff had tenderness over the sacroiliac joint bilaterally and the right lumbar facets. Id. Plaintiff also exhibited a positive leg raise test. Id. Motor strength and sensations were also intact. Id. Dr. Fahim recommended continued medications and injections (R. 302).

On January 11, 2010, Plaintiff met with Dr. James Gainer, M.D., at the Alpha & Omega Family Practice complaining of lower back pain (R. 332). Plaintiff indicated that he suffered from stiffness and numbness in his back and legs, and that he suffered from incontinence. Id. Review of systems revealed no negative symptoms. Id. Dr. Gainer noted no tenderness or no irregular sounds in Plaintiff's abdomen (R. 333). He assessed that Plaintiff had impotence, major depressive disorder, and lumbosacral neuritis. Id.

On July 13, 2010, Plaintiff returned to see Dr. Gainer for lower back pain and depression (R. 330). He indicated that he stopped taking some of his medications, but that he was still on the pain medicine that seemed to be helping. Id. Upon physical examination, Dr. Gainer noted Plaintiff's back had no tenderness or deformity. Id. Dr. Gainer diagnosed Plaintiff with lumbar disc displacement. Id. Dr. Gainer also noted that Plaintiff wished to continue conservative treatment and to avoid surgery if possible. Id.

Plaintiff met with Dr. Gainer again in early February 2011 complaining of lower back pain (R. 378). Plaintiff indicated that the pain has been increasing for the past two months and that it radiates into his hips and knees. Id. Review of systems revealed that no tenderness on Plaintiff's abdomen or extremities. Id.

On August 19, 2011, Plaintiff visited Dr. Gainer complaining of chest pain (R. 376). Review of systems revealed no negative symptoms. Id. Dr. Gainer noted when conducting a

musculoskeletal exam that Plaintiff exhibited normal gait, no muscular atrophy, and normal strength and tone (R. 377).

*2. Medical History Post-Dating November 21, 2011*

Plaintiff returned to Dr. Gainer on February 14, 2012 with chest pain (R. 373). Review of systems turned up negative symptoms. Id. Dr. Gainer noted that Plaintiff had no tenderness on his abdomen and extremities (R. 374). Dr. Gainer thereafter opined that Plaintiff suffered from lumbago and chronic pain syndrome. Id.

Plaintiff met with Dr. Gainer on August 14, 2012 complaining of worsening pain and bladder control (R. 397). Review of systems revealed that Plaintiff exhibited no tenderness and no irregular bowel sounds on his abdomen. Id.

On February 12, 2013, Plaintiff reported back to Dr. Gainer with back pain (R. 409). Still on his medication, he also indicated that he feels sharp pain and that he continues to have bladder control issues. Id. Review of systems revealed no tenderness and no irregular bowel sounds on Plaintiff's abdomen. Id. Dr. Gainer recommended surgery, which Plaintiff declined (R. 410).

In late August 2013, Plaintiff returned to Dr. Gainer with depression (R. 407). He indicated that his depression has lasted for over six months and it continues with his chronic back pain. Id. He also stated that he stopped taking his medicine due to the cost. Id. His bladder control problems still continue to plague him. Id. Dr. Gainer diagnosed Plaintiff with recurrent moderate major depressive disorder along with chronic pain syndrome and displaced lumber disc. Id. Dr. Gainer encouraged Plaintiff to reconsider the surgery option (R. 408).

On October 25, 2013, Plaintiff met with Ashley Elza, MOT, at Therapy Services, LLC, for an occupational therapy evaluation after being referred there by Dr. Gainer. Plaintiff stated that he is still in pain, which requires him to frequently switch positions and stand/walk around

the room (R. 415). Plaintiff demonstrated decreased shoulder flexion. Id. He also demonstrated 4/5 shoulder flexion and abduction; 5/5 elbow flexion; 4+/5 elbow extension; 5/5 wrist and hand measurements. Id. He also indicated that he needs minimal assistance for dressing (upper half of body); self-feeding; toileting; and food preparation (R. 416). The final assessment was that Plaintiff had decreased coordination, strength, range of motion, and pain management. Id. It was noted that Plaintiff had a fair rehabilitation potential for stated goals (R. 417).

*3. Medical Reports/Opinions*

On December 9, 2010, Dr. Arturo Sabio, M.D., conducted a consultative examination of Plaintiff. Review of Plaintiff's bodily systems revealed no findings out of the ordinary. Upon physical examination, Dr. Sabio noted, among other things, that Plaintiff ambulated with normal gait with no aids to assist him, had tenderness over the spine, had limited range of motion in the spine, knees, hips, had no muscle atrophy, and, in the Plaintiff's own words, had no incontinence (R. 351–353). In his summary, Dr. Sabio concluded that Plaintiff had degenerative arthritis in the spine and knees, and also had erectile dysfunction. Id.

At the end of December 2010, H. Scovern conducted a RFC assessment. Upon review of Plaintiff's records, Dr. Scovern concluded that Plaintiff could occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, and stand/walk about six hours and sit about six hours in an eight-hour workday (R. 358). H. Scovern also concluded that Plaintiff had unlimited pushing/pulling abilities. Id. Plaintiff had exhibited postural limitations, which included only occasional climbing, balancing, stooping, kneeling, crouching, and crawling (R. 359).

In April 2012, Dr. Sharon Joseph, Ph.D, completed a consultative examination of Plaintiff's mental status. Dr. Joseph noted no obvious physical limitations when meeting Plaintiff (R. 386). He also indicated that Plaintiff has been suffering from sleep disturbance, anxiety, and

depression. Id. Plaintiff's memory and concentration was impaired however (R. 387). In conclusion, Dr. Joseph stated that Plaintiff had adjustment disorder with depressed and anxious mood and pain disorder with both physical and psychological components. Id. Dr. Joseph also stated Plaintiff had a fair prognosis. Id.

On May 30, 2012, Dr. Kip Beard, M.D., conducted a consultative examination of Plaintiff. During the physical examination, Dr. Beard noted that Plaintiff walked with a mild left-limp, but could stand unassisted and arise from a seat with a little difficulty (R. 392). Dr. Beard opined that Plaintiff had no need for ambulatory aids. Id. In summary, Dr. Beard concluded that Plaintiff suffered from medial joint spurring, pain, tenderness, and motion loss without weakness or atrophy in his knee and that he suffered discomfort, muscle spasm, pain, tenderness, motion loss with a negative straight leg test, and no radiculopathy in his back (R. 394).

On November 12, 2012, Karl G. Hursey completed a psychiatric review technique of Plaintiff. In the report, he opined that Plaintiff did not have a severe impairment (R. 336). In addition, Plaintiff rated having no degree of limitation in activities of daily living, social functioning, and decompensation (R. 346). Plaintiff did have a mild degree of limitation in maintaining concentration, persistence, or pace. Id.

On June 12, 2012, state agency medical consultant Dr. John Shane, M.D., conducted a physical RFC assessment. After reviewing all of Plaintiff's medical records, Dr. Shane made the following conclusions on Plaintiff's exertional limitations: (1) occasionally lift/carry fifty pounds; (2) frequently lift/carry twenty-five pounds; (3) stand/walk about six hours; (4) sit about six hours in an eight-hour workday; and (5) unlimited push/pull abilities (R. 85). Next, Dr. Shane opined that Plaintiff could frequently climb ramps/stairs, balance, stoop, kneel, crouch, crawl and could only occasionally climb ladders/ropes/scaffolds. Id. Dr. Shane noted no manipulative,

visual, or communicative limitations (R. 86). He did state that Plaintiff's only environmental limitation was to avoid concentrated exposure to hazards. Id. Dr. A. Rafael Gomez, M.D., conducted another RFC assessment on July 20, 2012, and reached the same conclusions (R. 97–99).

In April 2013, Plaintiff visited Dr. Joseph A. Snead, M.D., for an impairment evaluation. In sum, Dr. Snead concluded that (1) Plaintiff suffered from a L5-S1 disc rupture with nerve root involvement, which caused his back pain, leg pain, radiculopathy, and incontinence; (2) Plaintiff cannot do any kind of work; (3) Plaintiff met the requirements for medical listing 1.04; and (4) Plaintiff cannot ambulate effectively to do any type of work, but can ambulate to do activities of daily living (R. 405).

### C. Testimonial Evidence

At the administrative hearing held on November 4, 2013, Plaintiff revealed his personal information. He was born on December 25, 1975, and was thirty-seven (37) years old at the time of the hearing (R. 47). He stated that he was currently married with two children ages seven (7) and three (3). Id. He completed his high school education, but has no completed any college course work (R. 48). At the time of the hearing, he testified that he does not receive income and is in the process of applying for a medical card (R. 48–49).

Plaintiff next testified regarding his work history. He stated that his last job he had was at the water plant as a laborer (R. 49). He also stated that he worked as a laborer for MEC Construction, which is a company that mainly builds bridges (R. 50). When describing this job, Plaintiff testified that the heaviest material he had to lift weighed thirty-five (35) pounds. Id. He ended up leaving his job due to the pain in his back. Id. He later stated that he quit receiving

unemployment from MEC Construction because it offered him another option to continue work at the water line job but he declined it because it was too hard and far from his home (R. 52).

When asked about his treatment for his back pain, Plaintiff indicated that he used injections and medication to help the pain (R. 51). From 2005 to 2011, he received eighteen (18) injections to cover the pain while he worked. Id. He also took the following medications: Tramadol; Hydrocodone; and Celebrex. Id.

Plaintiff then was asked by his attorney why he could not work at the water line job. Plaintiff testified that the pain in his back and legs along with the incontinence made him turn down the job (R. 53). Plaintiff indicated that he has to make four to five trips a day to the bathroom each lasting between five to ten minutes (R. 54). He stated that this problem has been ongoing for the past two years. Id. He further noted that his incontinence has negatively affected his marriage relationship with his wife. Id.

Regarding treatment options for his pain, Plaintiff did state that he was given an option to have surgery but turned it down (R. 55). He said that he turned down surgery because he had family have back surgery but that they came out worse than before. Id.

The testimony next turned to the discussion of Plaintiff's typical day. He stated that he cannot pick up his children much anymore, cannot go outside with his kids anymore, and cannot roll around on the floor with them either (R. 56). He stated that the reason he cannot do those things anymore is his constant pain. Id. He reported that his legs feel a lot weaker than before and cannot walk as far (R. 57). To alleviate his leg pain, Plaintiff stated that he has to get up and walk around his house a bit and prop his legs up when sleeping (R. 58–59).

Plaintiff then described his treatment plan of using the injections. He first testified that the injections were primarily used to mask his pain, but even after getting more injections he

pain never truly was cured (R. 60). He felt like his was abusing his back because he kept subjecting himself to more and more injections. Id.

Next, the ALJ questioned Plaintiff on his daily activities. Plaintiff stated that he walks around his backyard (R. 61). Additionally, Plaintiff reported cooking small meals when his wife is not around to prepare him something (R. 62). He also stated that he will take his children to his parents' house, who live about ten miles away, twice a month. Id. He reported that his parents live on a farm where his father raises steer. Id. He stated that he used to help out on the farm, but has not done so in the past few years (R. 63–64).

Plaintiff next testified that about his pain medication. He indicated that he takes Tramadol and Hydrocodone twice a day (R. 65). He stated that the medications dull the pain but do not fully take it away. Id.

Regarding his hobbies and activities, Plaintiff stated that he rarely leaves the house anymore (R. 66). He used to go fishing with his children but stopped doing so within the last two years. Id. He further stated that he used a walking device when he walks to the river or on any uneven surface. Id.

### D. Vocational Evidence

Ms. Linda Dezak, an impartial vocational expert, also testified at Plaintiff's administrative hearing.

The VE classified Plaintiff's work as a highway maintenance worker is normally low semi-skilled (R. 70). However, the VE further elaborated that because Plaintiff seemed to be the lead worker then his job should be classified as a SVP 4 or high semi-skilled. Id. The VE went to stated that the exertional level is medium but here is considered heavy based on Plaintiff's testimony. Id.

The ALJ then asked the VE the following hypothetical:

> Can I ask that you assume an individual with the same age, education, and past work experience as the claimant with the following attributes: said individual is capable of light exertional level work, can never climb ladders, ropers, or scaffolds, can occasionally perform all other postural activities. Said individual must avoid concentrated exposure to extreme cold, and all hazards such as dangerous moving machinery and unprotected heights. Can an individual with these limitations perform the claimant's past work?

(R. 69). The VE stated that such an individual would not be able to perform the past work but could perform other types of work: (1) bottling line attendant; (2) convenience store clerk; (3) and a waiter (R. 70).

The ALJ then added a limitation to the hypothetical: the individual must have the opportunity for 1–2 minute position changes every thirty (30) seconds (R. 71). The VE testified that all those jobs were still be available. Id.

The ALJ then added another limitation to the hypothetical: if the individual must be afforded the option of standing or walking for 15 minutes or sitting for 15 minutes alternatively without being off task—actually sitting for 30 minutes alternatively without being off task, would those jobs still be available? Id. The VE stated that those jobs would be available. Id. When asked what jobs would be available at the sedentary exertional level, the VE listed three jobs: (1) document preparer; (2) surveillance system monitor; and (3) mail sorter (R. 72). The VE further indicated that those jobs would be available at both the sedentary and light exertional level even if a person was limited to simple, routine and repetitive tasks. Id.

When asked about being "off task," the VE testified that going to the bathroom does not automatically make a person off task (R. 74). A person is off task if he goes to the bathroom on average more than six minutes per hour. Id.

### E. Report of Contact Forms, Work History Reports & Disability Reports

*1. Work History Report*

On October 6, 2010, Plaintiff filled out a work history report. In the report, Plaintiff declared that he worked in the construction industry, specifically in highway construction, from 1996 to August 21, 2010 (R. 197). He described this job as a "laborer," which required him to walk eight hours a day, stand for eight hours, sit for one hour, climb for two hours, stoop for ten hours, kneel and crouch for two hours, crawl for one hour, and handle small/large objects for ten hours (R. 198). He had to lift lumber and other materials everyday frequently weighing more than fifty pounds. Id.

*2. Disability Report*

Plaintiff filled out a disability report on October 6, 2010. He indicated that his lower back pain and knee issues limited his ability to work and eventually led to him stop working all together (R. 205). He further stated that he worked in the construction industry for fourteen years, which required him to walk, stand, lift, climb, sit, and handle many objects for long hours each day (R. 206–07). He noted that he has visited numerous doctors and hospitals to help treat his ongoing lower back pain (R. 208–10).

On March 2, 2012, Plaintiff filled a second disability report. He indicated that the following conditions caused him to stop working: (1) lower back injury, and left knee injury; (2) back injury; (3) arthritis; (4) degenerative disc disease; (5) herniated disc; (6) knee injury; (7) depression; (8) anxiety; (9) limited ability to perform sexual intercourse; (10) nerve damage; and (11) physical limitations (R. 226). Plaintiff stated that he quit working in large part because he could not work on the "easy jobs," which were suited to his work ability, and therefore working on harder jobs caused more pain (R. 234).

On June 28, 2012, and August 8, 2012, Plaintiff filled out two appeal disability reports. In both reports, he indicated that there has been no change since the March 2nd report (R. 245–49, 256–60)

## F. Lifestyle Evidence

### 1. Adult Function Report

On October 18, 2010, Plaintiff completed an adult function report. He stated that his pain limits his ability to bend, kneel, squat, lift heavy objects, balance, and drive long distances (R. 213). When describing his typical day, Plaintiff stated that he makes his own meals,[2] takes care of his son and new baby, help with chores, take trash out, bathe the kids, feed and give water to the pets, and do some yard work[3] (R. 214). Due to his pain, Plaintiff noted that he cannot play sports anymore, work, or get an interrupted night of sleep. Id. Plaintiff can still take care of his own personal care but does note that it takes a little longer to get dressed and bathe due to the stiffness in his back. Id. He stated that he goes outside almost every day either by walking or driving in a car (R. 216). He also noted that he does shop with his wife occasionally. Id. Regarding his hobbies and social activities, Plaintiff indicated that he cannot hunt or fish as well as he used too, but he still is able to visit family and attend church although not as often as he would like (R. 217–18). To help the pain, he wears a back brace prescribed by his doctor (R. 219). Finally, regarding his physical abilities, Plaintiff stated that he could walk on level surfaces for a few hundred yards before taking a 10–15 minute break (R. 218). He noted that he feels pain when he does other physical activities such as lifting or squatting. Id.

Plaintiff filled out a second adult function report on March 15, 2012. Contrary to his last

---

[2] Plaintiff stated that a few times a week he makes sandwiches, soup, streak, eggs, toast, and microwaved meals (R. 215). He cannot prepare complete meals however. Id.
[3] Regarding yard work, he occasionally mows the lawn in a riding mower, take trash out, and do house repairs as long as it does not require too much kneeling or bending (R. 215).

report, Plaintiff this time stated that he cannot move around as much and has to let his wife take care of the kids the majority of the time (R. 236). He still can take care of the pets, make meals, do minor yard work, drive a car, walk, and shop (R. 237–239). However, he now hardly ever fishes or hunts, and can occasionally only visit or attend church (R. 239). Due to his back pain, Plaintiff reported that he cannot concentrate or complete tasks anymore and can no longer lift, squat, bend, stand much, kneel, or sit for a long time (R. 240). In conjunction with his back brace, he now wears a knee brace too (R. 241).

### III. THE FIVE STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the [RFC] of the claimant is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once this is proven, the burden of proof shifts to the Government during step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## IV. THE ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since November 21, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; osteoarthritis of the left knee status post ACL and PCL repair; obesity; adjustment disorder with depressed and anxious mood; and pain disorder with both physical and psychological components (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations: can never climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs, balance, stoop, crouch, crawl, kneel and stoop; must avoid concentrated exposure to extreme cold and all hazards such as dangerous moving machinery and unprotected heights; must be afforded the opportunity to stand or walk for 15 minutes or sit for 30 minutes alternatively without being off task; and is capable of performing simple, routine and repetitive tasks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on December 25, 1975, and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 21, 2011, through the date of this decision (20 CFR 404.1520(g)).

## V. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a

conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1. Because the ALJ's credibility analysis is based on the ALJ's unsupported accusation that Mr. Ketterman and his Counsel contrived to produce a mid-hearing bathroom break, is further based on the ALJ ignoring Mr. Ketterman's request to amend his onset date, is further based on the ALJ's belief that Mr. Ketterman should have gotten surgery, and is further based on the ALJ's finding that Mr. Ketterman has a sunburn, then this Court must remand this case as the ALJ's findings are not supported by any evidence and is based on the ALJ's failure to follow the regulations (Pl.'s Br. at 6–11).

2. Because the ALJ did not compare Mr. Ketterman's symptoms to the appropriate Listing criteria and then declared that the report of Dr. Snead was unsupported by substantial evidence, then this Court must find that the ALJ erred as a matter of law and must remand this case as the wealth of evidence clearly supported Dr. Snead's opinion (Pl.'s Br. at 11–15).

The Commissioner contends:

1. Substantial evidence supports the ALJ's credibility determination (Def.'s Br. at 8–11).

2. Substantial evidence supports the ALJ's finding that Plaintiff's musculoskeletal impairments do not meet or equal a listing (Def.'s Br. at 11–13).

## C. Credibility Determination

Plaintiff raises several objections in arguing that the ALJ's credibility determination is not supported by substantial evidence: (1) ALJ does not have any evidence to prove that Plaintiff's mid-hearing bathroom break was "contrived"; (2) ALJ ignored Plaintiff's request for an amended onset date and then used evidence before the onset date to discredit Plaintiff; (3) ALJ discredited Plaintiff for not electing to undergo surgery; and (4) ALJ discredited Plaintiff for having a sunburn during the hearing (Pl.'s Br. at 6–11).

Citing to the two-step credibility determination process, Defendant argues that substantial evidence supports the ALJ's credibility determination (Def.'s Br. at 8–11).

The determination of whether a person is disabled by pain or other symptoms is a two-step process. See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96–7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment[4] capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of the subjective allegations in light of the entire record. Id.

Social Security Ruling 96–7p sets out some of the factors used to assess the credibility of an individual's subjective symptoms, including allegations of pain, which include:

1. The individual's daily activities; 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. Factors that precipitate and

---

[4] Step one is fulfilled here. The ALJ in her decision stated that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . ." (R. 26).

aggravate the symptoms; 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96–7p, 1996 WL 374186, at *3 (July 2, 1996).

The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09cv55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets her basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08cv178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

### 1. Plaintiff's Mid-Hearing Bathroom Break

When discussing Plaintiff's bladder control, the ALJ made the following determination:

The claimant appears to be exaggerating his limitations. He testified to frequent loss of bladder and bowel control, four or five times a day. In fact, he had to leave the hearing for a bathroom break, which his counsel timed upon return.[5] This

_____

[5] Pertinent testimony of the administrative hearing:
    Q: So elevating your legs kind of help take away the pain?

episode appeared to be contrived, especially in light of the fact that he has never complained of any more than "occasional" or "sometimes" loss of bladder/bower control to primary care physician. In regards to this condition, he has also declined referral to a specialist preferring to stick with pain medications only and he had no complaints of this problem prior to August 2012.

(R. 26).

Plaintiff takes offense to the accusation[6] that the mid-hearing bathroom break was a stunt and argues four reasons why the ALJ's credibility determination is not supported by substantial evidence: (1) no evidence exists showing that Plaintiff's counsel timed the bathroom break; (2) the ALJ did not question Plaintiff at the hearing about the bathroom break; (3) the ALJ did not question Plaintiff's counsel during or after the hearing about the matter; and (4) the ALJ cites to no evidence to support her accusation (Pl.'s Br. at 7). Reiterating what the ALJ discussed in her analysis, the Defendant argues that substantial evidence supports the ALJ's reasoning because courts give high deference to an ALJ's observations during a hearing (Def.'s Br. at 11). Plaintiff, in his response, makes three principal arguments to counter Defendant's assertion: (1) Plaintiff argues that the ALJ did not make any "observations" of Plaintiff's bathroom break; (2) the record does not support the ALJ's defamatory comments; and (3) social security hearings, in

---

A: It kind of soothes it, yeah; it takes the pressure off. I need to go out here for minute.
ALJ: You need to go to the bathroom?
CLMT: Yes, I think.
ATTY: Okay, go right ahead. Excuse us for a minute, judge.
ALJ: Mm-hmm.
Atty: Do you know where it is?
CLMT: Yeah
Q: Now, Mr. Ketterman, I don't need a play by play of what happened, but why did you have to get up and leave this—or leave his hearing for a few minutes?
A: To go to the bathroom
Q: Do you know how long you were in the bathroom?
A: No, sir.
(R. 58–59).
[6] Plaintiff's counsel filed a misconduct complaint against the ALJ, but the Appeals Council chose not to review it (Pl.'s Resp. at 6 n. 4).

general, are informal in nature and thus Plaintiff was allowed to take bathroom breaks (Pl.'s Resp. at 4–5).

The undersigned agrees with Plaintiff that no substantial evidence exists supporting the ALJ's assertion that the mid-hearing bathroom break was contrived. During the relevant part of the questioning, Plaintiff's incontinence was not being discussed when Plaintiff was excused (R. 58–59). In fact, it was the ALJ herself, not Plaintiff's attorney, who asked Plaintiff whether he had to go to the bathroom (R. 59). Additionally, Plaintiff, upon his return, could not answer his attorney's question of how long he was in the bathroom (R. 59). The undersigned also highlights that upon Plaintiff's return the questioning flowed back into what was being previously discussed before the break (R. 59). The ALJ did not reference the bathroom break at all during the rest of the hearing either. Therefore, based on the available evidence, the undersigned finds that nothing supports that the ALJ's determination, thus mandating remand, that the mid-hearing bathroom break was a planned stunt between Plaintiff and his attorney.

## 2. Plaintiff's Amended Onset Date

The ALJ determined that Plaintiff's alleged onset date was November 21, 2011 (R. 20). Plaintiff, however, argues that the onset date should be amended to July 2012 (Pl.'s Br. at 8). Specifically, Plaintiff states that the ALJ did not utilize the three-prong test from SSR 83-20p and that the ALJ instead used evidence from the time period he was not disabled to discredit him. Id. Defendant, on the other hand, argues that Plaintiff's contention that he was disabled when he collected unemployment[7] is still a factor the ALJ can consider when determining Plaintiff's

---

[7] At the administrative hearing, Plaintiff addressed the fact that he was working in 2011 and he took unemployment benefits:

> ATTY: . . . I think we need to move his onset date to July of '12; certainly to I guess address this fact that yeah, he was working in 2011, and he took unemployment which arguably means that he thought he could go out and work.

credibility (Def.'s Br. at 10). Plaintiff responded stating that Defendant did not provide any reasons why the ALJ did not incorporate SSR 83-20p's three-prong test (Pl.'s Resp. at 3).

SSR 83–20p is "binding on all components of the Social Security Administration," including ALJs, 20 C.F.R. § 402.35(b)(1), and sets forth an analytical framework for assessing the date of onset for a disability of traumatic or non-traumatic origin. It provides that a disability is of "traumatic origin," where after the date of injury, "the individual is thereafter expected to die as a result or expected to be unable to engage in substantial gainful activity (SGA) (or gainful activity) for a continuous period of at least 12 months." SSR 83–20, 1983 WL 31249, at *2 (Jan. 1, 1983). Where a disability is of traumatic origin, the date of onset is the date of the traumatic injury. Id.

Additionally, SSR 83–20p provides a framework for examining injuries that are not considered of "traumatic origin" under the regulation. Under SSR 83–20p, an ALJ must consider three factors when determining the onset date of disabilities of a non-traumatic origin: (1) the claimant's alleged onset date; (2) the claimant's work history; and (3) medical and all other relevant evidence. See id. at *2. The date that the claimant alleges as an onset date should be the starting point of the analysis, and that date "should be used if it is consistent with all the evidence available." Id. at *3. The day when the impairment caused the individual to stop work is also important. See id. Nevertheless, medical evidence is "the primary element in the onset determination," and the date chosen "can never be inconsistent with the medical evidence of record." Id. at *2–3. This does not mean that a claim is doomed for lack of medical evidence

---

But I don't think that necessarily was true. Mr. Ketterman is just—you'll hear him testify—he's the kind of man that was brought up to work and to work no matter what, and it just became too much for him, after six or seven years of having to deal with it.

(R. 46).

establishing the precise date an impairment became disabling. In such cases, the ALJ must "infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process" and should seek the assistance of a medical expert to make this inference. Id. at *2. Where no reasonable inference is possible based on the available evidence and additional medical evidence is not available, "it may be necessary to explore other sources of documentation . . . from family members, friends, and former employees to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition." Id. at *3.

Here, Plaintiff's impairments constitute a "non-traumatic" origin thus invoking the three factor test from SSR 83-20p. Id. at *2. The ALJ determined that Plaintiff's onset date was November 21, 2011 (R. 20). However, during the administrative hearing, Plaintiff moved for a new onset date of July 2012 (R. 46). The ALJ in her decision makes no mention of this new onset date. Thus, the Court cannot conduct a thorough analysis on this issue without further discussion by the ALJ on why the new onset date was disregarded. Accordingly, the undersigned finds that remand is necessary for further consideration on this matter.

### 3. Plaintiff's Election Not to Undergo Surgery

The ALJ noted that Plaintiff seemed to be "exaggerating" his symptoms based on his conservative treatment:

> [Plaintiff] has been offered surgical treatment but to date has chosen to have only conservative (sic). He had physical therapy in 2005 and epidural injections for his back. Currently, he takes pain medications only for treatment . . . . Physical examinations that [Plaintiff] has had by his primary care physician and consultative examiners have been relatively benign compared to his allegations . . . . In regards to his [back] condition, [Plaintiff] has also declined referral to a specialist preferring to stick with pain medications only and he had no complaints of this problem prior to August 2012. The claimant constantly sat and stood during the hearing, which was also suspicious for exaggeration.

(R. 26).

Plaintiff argues that the ALJ's decision to discredit him for not electing to undergo surgery was in error because (1) ALJs are not doctors and cannot substitute their own judgment; (2) the record demonstrates that Plaintiff followed the medical treatment plan laid out by his doctors; and (3) Plaintiff was "wary" to elect surgery due to past family history and the financial burden (Pl.'s Br. at 9–10). Defendant counters that (1) the ALJ discussed the disparity between Plaintiff's symptoms and conservative treatment; and (2) Plaintiff's decision not to have surgery was "one of several reasons that the ALJ raised for discounting Plaintiff's credibility" (Def.'s Br. at 9–10). Plaintiff in his response reiterated that Plaintiff's doctors decided to put off surgery and continue injections, and that Plaintiff was fearful of undergoing the procedure (Pl.'s Resp. at 2 n.2).

Despite Plaintiff's argument to the contrary, the ALJ followed the analysis outline in Craig as prescribed. The ALJ summarized at length Plaintiff's medical records in her decision (R 27–34). Moreover, pursuant to SSR 96-7p, the ALJ noted, which is also supported by the record, the discrepancies between Plaintiff's symptoms and his treatment methods (R. 26, 31, 32, 33). In addition, the ALJ also noted that Plaintiff himself during the administrative hearing testified that he was recommended surgery from several treating physicians but declined to undergo the procedure (R. 26, 55). However, Plaintiff's choice in not following through with surgery was not the *sole* reason why the ALJ discounted his credibility. The ALJ factored in other evidence gathered from Plaintiff's testimony coupled with the medical record when determining Plaintiff's credibility (R. 26).

If the ALH discredited Plaintiff solely based on his decision to not undergo surgery, the undersigned would be inclined to agree with Plaintiff's argument; nonetheless, because the ALJ

factored in other pieces of evidence, besides the choice to not do surgery, when determining Plaintiff's credibility the undersigned finds that substantial evidence supports the ALJ's analysis here.

### 4. Plaintiff's Sunburn

In her decision, the ALJ further discredited Plaintiff's credibility based on the existence of Plaintiff's sunburn:

> The undersigned also noted that the claimant had a sunburn. There were no reports of any skin condition in the medical evidence of record and the claimant did not complain of any skin condition. The claimant testified that he could no longer help out of the family farms owned by family members but this sunburn brings doubt to these assertions.

(R. 27).

Essentially arguing that the ALJ's assertion is "ipse dixit," Plaintiff states that substantial evidence does not support the ALJ's credibility determination here because (1) the ALJ has never seen Plaintiff before the hearing and has no frame of reference to determine Plaintiff's skin tone; and (2) the ALJ does not provide support of how having sunburn detracts from Plaintiff's credibility (Pl.'s Br. at 10). Defendant simply argues that the sunburn led the ALJ to "reasonably believe[]" that Plaintiff's assertion that he was no longer working on the farm was in fact a misnomer (Def.'s Br. at 11). Plaintiff's response basically re-asserts his previous arguments repeating that the record offers no evidence linking Plaintiff's sunburn to working on the farm (Pl.'s Resp. at 6).

The undersigned agrees with Plaintiff here. Although an ALJ's observations at hearings are rightly afforded great deference, there is no evidence in the record demonstrating that Plaintiff's sunburn came from working on his family farms. See SSR 96–7p, 1996 WL 374186, at *4 (July 2, 1996). The undersigned believes that it is just not a reasonable jump in logic to

automatically assume that because Plaintiff is sunburnt therefore he must have been working on his family farms—there are many potential reasons why a person would have sunburn. Additionally, the undersigned agrees with Plaintiff's argument that the ALJ has never seen Plaintiff in person before the hearing and thus cannot determine his skin tone just from the medical record.

Accordingly, the undersigned finds that the ALJ's credibility determination based on Plaintiff's sunburn is not based on substantial evidence thus mandating remand.

### D. Medical Listing 1.04(C)

Plaintiff contends that the evidence shows that he meets the requirements for medical listing 1.04(C) (Pl.'s Br. at 11). Specifically, Plaintiff makes several arguments in support of his assertion. First, he states that the ALJ did not compare his symptoms to the criteria of listing 1.04(C) in either step three or step four of the decision. Id. at 12. Next, Plaintiff states that the ALJ's failure to make this comparison is not harmless error because the medical evidence demonstrates that the listing 1.04(C) criterion, which includes the ability to ambulate, is fulfilled. Id. at 13–14.

Defendant, on the other hand, argues that substantial evidence supports the finding that Plaintiff's conditions do not equal the severity of medical listing 1.04(C) (Def.'s Br. at 11). Specifically, Defendant states that the evidence presented does not establish that Plaintiff had the inability to ambulate effectively, which is a required element of listing 1.04(C). Id. at 12–13.

In his response, Plaintiff argues that the ALJ did not address the evidence in her decision, which demonstrated that he did not have the ability to ambulate effectively (Pl.'s Resp. at 7–8).

The ALJ in her decision determined that Plaintiff's impairments did not meet any musculoskeletal listings in section 1.00 because there was "no evidence that the claimant's back

impairments or knee impairments result[ed] in an inability to ambulate effectively as defined in Section 1.00B2b" (R. 22).

The listings under the regulations, located at Appendix 1, Subpart P of Part 404, are "descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect" with each impairment "defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 529–30 (1990). Used as a regulatory device, the listings quicken the decision-making process to identify claimants whose impairments are so severe that they would be found disabled regardless of the vocational background. Id. at 532. Yet, no matter how severe or troublesome Plaintiff's symptoms may be, "to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." Id. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify"). This is a high standard to meet but it was purposefully made this way. See id. at 532 ("The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard").

To qualify under medical listing 1.04(C), Plaintiff must demonstrate the following: "Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and *resulting in inability to ambulate effectively*, as defined in 1.00B2b." 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.04(C) (emphasis added). The inability to ambulate, as defined by the regulations, "means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Id. at § 1.00B2b(1). For a person to ambulate effectively, he or she "must be capable of

sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." Id. at § 1.00B2b(2).[8]

When evaluating whether a claimant meets one or more of the listed impairments, the ALJ must identify the relevant listings and then compare each of the listed criteria to the evidence of the claimant's symptoms. Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The Cook rule thus seemingly "requires an ALJ to compare the plaintiff's actual symptoms to the requirements of any relevant listed impairments in more than a 'summary way.'" Id. at 1173. "[A] mere conclusory analysis of the plaintiff's impairments pursuant to the regulatory listings" by the ALJ will not suffice. Fraley v. Astrue, No. 5:07cv141, 2009 WL 577261, at *25 (N.D. W. Va. Mar. 5, 2009). Absent such a comparison by the ALJ, the Cook court stated "it is simply impossible to tell whether there was substantial evidence to support the determination." Cook, 783 F.2d at 1173.

Here, the ALJ only stated that "[t]here is no evidence that the claimant's back impairments or knee impairments result in an inability to ambulate effectively . . ." (R. 22). No analysis or explanation was given to support this conclusion. While the ALJ did state that this conclusion "w[ould] be more fully explained below," not once in the rest of the decision did he mention listing 1.04(C) again. See Hardman v. Comm'r of Soc. Sec., No. 5:14cv132, 2015 WL 1221357, at *15 (N.D. W. Va. Mar. 17, 2015) (holding that remand is necessary because the ALJ

_____

[8] The regulations list several examples of ineffective ambulation:

> the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation

20 C.F.R. Part 404, Subpt. P, App. 1, § 1.00B2b(2).

there likewise did not "fully explain" the reasoning in the decision). Although the Fourth Circuit has held in <u>Russell v. Chater</u> that <u>Cook</u>'s "inflexible rule requiring an exhaustive point-by-point discussion" is not required "in all cases," that case can be distinguished from this one because the ALJ here, unlike in <u>Russell</u>, did not "discuss[] the evidence in detail and amply explain[] the reasoning which supported his determination." <u>Russell v. Charter</u>, No. 94-2371, 1995 WL 417576, at *3 (4th Cir. July 7, 1995).

Given the ALJ's deficient analysis, the undersigned cannot conclude that her determination that Plaintiff does not equal listing 1.04(C) is supported by substantial evidence. Nor can the undersigned find that such error is harmless "because the Social Security regulations state that if a person's impairments meet or equal a Listing, she is disabled under the regulations and would be entitled to benefits with no further analysis required." <u>Cashin v. Colvin</u>, No. 1:12cv909, 2013 WL 3791439, at *6 (N.D. Ohio July 18, 2013); <u>see also</u> <u>Vest v. Colvin</u>, No. 5:13cv00067, 2014 WL 4656207, at *27 (E.D. Va. Sept.16, 2014).

Accordingly, the undersigned recommends that the issue be remanded back to the ALJ for further consideration.

### E. Dr. Snead's Medical Opinion

Lastly, Plaintiff asserts that Dr. Snead's medical opinion is not an outlier and thus should be entitled to more weight (Pl.'s Br. at 14–15). Defendant, conversely, argues that the ALJ's determination to assign lesser weight to Dr. Snead is supported by substantial evidence because Dr. Snead's opinion is inconsistent, he opined on an issue reserved for the Commissioner, and he only examined Plaintiff once (Def.'s Br. at 13 n. 1).

The ALJ afforded Dr. Snead some, but not controlling, weight because (1) Dr. Snead only examined Plaintiff once; (2) the opinion was based on Plaintiff's subjective complaints; (3)

the evidence of the record does not support the opinion; and (4) Dr. Snead opined on the issue of disability (R. 27).

The regulations, specifically 20 C.F.R. § 404.1527(c), discuss how the ALJ weighs treating source medical opinions:

> *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> > (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> > (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.
> >
> > > (i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization.* We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors.* When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Although it is not binding on the Commissioner, a treating physician's opinion is entitled

to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut

it.  See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Such opinions should be accorded

great weight because they "reflect[] an expert judgment based on a continuing observation of the

patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187

(4th Cir. 1983).  In Craig v. Chater, however, the Fourth Circuit further elaborated on this rule:

> Circuit precedent does not require that a treating physician's testimony "be given
> controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact,
> 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> > [i]f we find that a treating source's opinion on the issue(s) of the
> > nature and severity of [the] impairment(s) is well supported by
> > medically acceptable clinical and  laboratory diagnostic techniques
> > and is not inconsistent with the other substantial evidence in [the]
> > case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical
> evidence or if it is inconsistent with other substantial evidence, it should be
> accorded significantly less weight.

76 F.3d 585, 590 (4th Cir. 1996). In addition, "[n]either the opinion of a treating physician nor

the determination of another governmental entity are binding on the Secretary." DeLoatch v.

Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983). Thus, "[t]he treating physician rule is not

absolute." See Hines v. Barnhart, 453 F.3d 559, 563 n.2 (4th Cir. 2006).

Some issues are reserved specifically for the Commissioner and opinions on such issues

"are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183,

at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a

claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Therefore, a

medical source that offers an opinion on whether an individual is disabled or unable to work "can

never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL

374183, at *5.

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). An ALJ's failure to do this "approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977) (quoting Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974)).

Here, Dr. Snead in his opinion concluded that Plaintiff was unable to do any kind of work due to his back pain and bowel weakness (R. 405). As mentioned previously, the Commissioner alone is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). A medical source that offers an opinion on whether an individual is disabled or unable to work "can never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5. Therefore, Dr. Snead's opinion was not entitled to controlling opinion. However, the analysis does not automatically end there.

Although Dr. Snead's opinion is not entitled controlling weight, the opinion may not be summarily dismissed on that basis but instead must be evaluated "in light of the entire record to determine the extent to which the [treating physician's legal conclusion] is supported by the record." Morgan v. Barnhart, 142 F.App'x 716, 723 (4th Cir. 2005) (quoting SSR 96-5p, 1996 WL 374183, at *3). The ALJ must therefore consider the factors from the regulations to determine what weight to afford the opinion. See 20 C.F.R. § 404.1527(c)(1–6). However, the ALJ does not have to list and address each factor in his or her opinion. See, e.g., Beland v. Comm'r of Soc. Sec., No. 1:14cv138, 2015 WL 5169112, at *4 (N.D. W. Va. Sept. 1, 2015).

In her analysis, the ALJ incorporated into her decision the length of treating relationship and consistency when she commented that Dr. Snead only examined Plaintiff once and that the objection evidence does not support his opinion (R. 27). The ALJ can use these factors when determining how much weight to afford a medical opinion. See 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion"); 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"). Therefore, the undersigned finds that the ALJ provided sufficient reasons for not assigning controlling weight to Dr. Snead's medical opinion.

## VI. RECOMMENDED DECISION

Nonetheless, for the reasons herein stated, I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this matter be **REMANDED** for the reasons stated forth within.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John P. Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide an authenticated copy of this Report and Recommendation to counsel of record.


Respectfully submitted this 12th day of January, 2016.


MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE